USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-14-17

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

DAWN CHAMPION,

     **Plaintiff,**

  -against-

NANCY A. BERRYHILL,[1]
**Acting Commissioner of Social Security,**

     **Defendant.**

---

**REPORT AND**
**RECOMMENDATION**

**16-CV-4723 (AT) (RLE)**

**To the HONORABLE ANALISA TORRES, U.S.D.J.:**

## I.  INTRODUCTION

Plaintiff Dawn Champion ("Champion") commenced this action under the Social Security Act (the "Act"), 42 U.S.C. § 405(g) and § 1383(c)(3), challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying her claim for Social Security Disability ("SSD") and Supplemental Security Income ("SSI"). (Doc. No. 1.) On June 24, 2016, this case was referred to the undersigned for a Report and Recommendation. (Doc. No. 6.) On February 6, 2017, Champion moved for a judgment on the pleadings, asking the Court to reverse the final decision of the Commissioner, or, alternatively, remand the case for further proceedings. (Doc. Nos. 16, 17, Mem. of Law in Supp. of Pl.'s Mot. for J. on the Pleadings ("Pl.'s Mem.").) Champion argues that the Administrative Law Judge ("ALJ") failed to (1) fully and fairly develop the record concerning Champion's mental health impairments; (2) consider new and material evidence submitted to the Appeals Council; and (3) properly consider Champion's credibility. (*Id.* at 12-18; Transcript of Administrative Proceedings ("Tr.") at 315-

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the title of this action is revised to automatically substitute the name of the current Acting Commissioner of Social Security.

18.) On April 7, 2017, the Commissioner cross-moved for judgment on the pleadings, asking the Court to affirm the Commissioner's decision. (Doc. Nos. 18-19, Mem. of Law in Supp. of Def.'s Cross-Mot. for J. on the Pleadings ("Def.'s Mem.").) The Commissioner argues that the ALJ (1) satisfied his duty to develop the record; (2) properly found that Champion did not have a severe psychiatric impairment; (3) properly determined that Champion could perform a wide range of light work; (4) properly assessed Champion's credibility; and (5) properly determined that Champion was able to perform her past relevant work. (*Id.* at 15-22.) For the reasons set forth below, I recommend that Champion's motion be **GRANTED**, the Commissioner's cross-motion be **DENIED**, and the case be **REMANDED** to the Commissioner for further development of the record.

## II.    BACKGROUND

### A. Procedural History

Champion applied for SSD benefits on September 19, 2012, and SSI benefits on September 26, 2012. (Tr. at 124-25.) She claimed a disability onset date of May 14, 2010. *Id.* Her application was denied on February 6, 2013, (*Id.* at 146-51), and on March 13, 2013, Champion requested a hearing before an ALJ. (*Id.* 166-70.) A hearing was held before ALJ Moises Penalver ("ALJ Penalver" or "the ALJ") on April 23, 2014, where Champion proceeded *pro se*. (*Id.* at 191-207.) The ALJ issued a decision on November 10, 2014, finding that Champion was not disabled within the meaning of the Act and was not entitled to disability benefits. (*Id.* at 30-48.) Champion retained counsel on December 23, 2014, and review by the Appeals Council was requested on January 5, 2015. (*Id.* at 23-26.) On May 9, 2016, the Appeals Council denied Champion's request for review and ALJ Penalver's decision became the

final decision of the Commissioner. (*Id.* at 1.) Champion field this action on June 21, 2016. (Doc. No. 1.)

## B. The ALJ Hearing

### 1. Champion's Testimony at the Hearing

ALJ Penalver conducted a hearing on April 23, 2014. (*Id.* at 68.) At the time, Champion was forty-five and testified that she was homeless and "bouncing from place to place." (*Id.* at 68-69.) Champion testified that she was in a motor vehicle accident on April 1, 2003, during which she injured her lumbar spine, rotator cuff in her right shoulder, left shoulder, right and left knees, right ankle, and right wrist. (*Id.* at 78-80.)[2] Champion underwent surgery for both knees, her left shoulder, her right ankle, and her right wrist but did not undergo surgery for her back or right shoulder because "it was just too much for me at that time to do all the surgery like that." (*Id.* at 79.) Champion testified that her disability began May 14, 2010,[3] and that she was in another motor vehicle accident on December 9, 2010, during which she reinjured her lower back and left hand. (*Id.* at 78-80.)

Champion testified that she subsequently developed osteoarthritis in her back, knees, ankles, and right wrist, as well as chronic asthma, major depression, panic and anxiety attacks, and hypertension. (*Id.* at 81-89, 93-94.) Champion stated that she treats her asthma with a Ventolin pump two to three times per day and an albuterol nebulizer every four to six hours. (*Id.* at 82-83.) Champion also stated that she has had multiple emergency room visits for asthma, during which she was treated with a nebulizer and prednisone steroids. (*Id.* at 86.) As to

---

[2] Pl.'s Mem. seems to confuse accident dates. (Doc. No. 17 at 5). In Champion's memorandum, she states there was a 2010 accident and a subsequent accident, but the administrative record suggests her first accident was actually in 2003 and the 2010 accident was the second accident. After Champion listed several injuries, the ALJ asked, "and all that's in 2003?" Champion replied. "Yes." (Tr. at 23.)

[3] The administrative record incorrectly states Champion's alleged onset date as May 2012. (Tr. at 64; *but see id.* at 124-25.)

treatment for major depression, Champion testified that she sees therapist Dr. Dowling "three times a week, or as often as I can." (*Id.* at 92.) As for her panic and anxiety attacks, Champion testified that she had had a mild heart attack in November 2012 that was later diagnosed as a panic attack. (*Id.* at 86.)

With regard to her daily activities, Champion testified that she can do her own laundry but that her daughter does her grocery shopping because Champion cannot bend down, reach up, or lift full grocery bags. (*Id.* at 102.) Additionally, Champion testified that she can only walk for two or three blocks, stand for approximately one hour, and sit for a maximum of ten minutes before her lower back starts to hurt. (*Id.* at 102-03.) Champion also testified that she is unable to attend church regularly, is unable to visit friends or relatives, and needs her daughter's assistance with light housework like sweeping, mopping, and vacuuming. (*Id.* at 104.)

Champion testified that her disability began when she was laid off in May 2010, and that she received unemployment benefits from June 2010, to March 2013. (*Id.* at 73-74.) Champion pursued a bachelor's degree from Boricua College full-time "after [she] came out of depression," between September 27, 2010, and June 7, 2013. (*Id.* at 76-77.) At the time of the hearing, Champion testified that she was a Security, Safety, and Support Aid for the mentally ill and substance abusers at Western United and that she worked the night shift full-time. (*Id.* at 71, 86-100.) She testified that her responsibilities included monitoring the building and the residents, distributing medication, walking the premises every half-hour, and handling incidents (more specifically, deescalating altercations), and writing incident reports. (*Id.* at 90, 96-101.) Champion testified that she reinjured her back while handling a physical altercation and that she has been missing "days [of work] for approximately one or two months" because of related back pain and asthma. (*Id.* at 70, 73, 99.)

## 2. Medical Evidence

### a. Treating Physicians

#### (1) Dr. Aaron Fox, MD

Dr. Aaron Fox ("Dr. Fox") started treating Champion in the Fall of 2002. (*Id.* at 284.)
On July 22, 2011, Champion met with Dr. Fox for a visit regarding her asthma and hypertension
management. (*Id.* at 617, 774.) Dr. Fox observed glucose intolerance, eczema, and hypertension
and recommended preventative health care for weight loss. (*Id.* at 619, 776.) He prescribed
hydrocortisone for eczema. *Id.*

On November 2, 2011, Champion returned to Dr. Fox and reported back spasms and knee
pain. (*Id.* at 609, 766.) Champion expressed concerns about osteoarthritis and requested x-rays.
*Id.* Fox did not observe worrisome signs of osteoarthritis and prescribed Chlorthalidone for
hypertension. *Id.* Champion had x-rays on November 9, 2011, which revealed minimal
degenerative changes in her left knee. (*Id.* at 627.)

On March 21, 2012, Champion met with Dr. Fox with reports of worsening back pain, as
well as left knee pain and severe left ankle pain. (*Id.* at 604-08.) Champion requested an MRI of
her back, her left knee, and her left ankle. (*Id.* at 604.) Dr. Fox recommended physical therapy
for Champion's back and diagnosed mild osteoarthritis in her left knee. (*Id.* at 606.) Dr. Fox
recommended weight loss and exercise and referred Champion to an orthopedist to explore
additional treatment options. (*Id.* at 606-607.) Dr. Fox also recommended avoiding chemicals in
response to Champion's alopecia and healthy eating in response to Champion's hypertrophic
cardiomyopathy. (*Id.* at 607.)

On October 3, 2012, Champion returned to Dr. Fox with complaints of worsening
asthma, possibly as a consequence of stress; continuing back pain, although she admitted she had

not been attending physical therapy; and ankle pain. (Tr. at 588-91.) She also reported pain in the hypothenar muscles of her right hand and wrist. (*Id.* at 588.) Champion added that she was not sleeping, was suffering from a depressed mood and irritability, and was concerned that she would not be able to continue with school. *Id.* Dr. Fox diagnosed Champion with de Quervain's tenosynovitis of the right wrist and sent her for a cortisol injection. (*Id.* at 590.) Dr. Fox continued to recommended physical therapy for her chronic lower back pain and referred her to Dr. Dowling for therapy for depression. (*Id.* at 590-91.) Champion underwent an MRI of her lower spine on October 8, 2012, which was significant for mild degenerative changes at the L2-L3, L3-L4, and L4-L5 levels. (*Id.* at 625-26.)

Champion returned to Dr. Fox on November 14, 2012, reporting that she had recently been hospitalized for myocardial infarction, though her stress-test had been negative. (*Id.* at 583-87, 745-49.) Dr. Fox indicated that Champion was being treated for coronary artery disease and hypertension and noted that Dr. Fox would consider increasing Champion's Lisinopril medication based on the results of her next blood pressure test. (*Id.* at 585-86, 747-48.) Dr. Fox noted that Champion was seeing Dr. Dowling for her depression and that she was reportedly feeling better. (*Id.* at 586, 748.)

Champion returned to Dr. Fox for a follow-up visit on December 12, 2012. (*Id.* at 576-82.) She reported left upper chest pain when agitated, headaches, and back pain, although she had stopped physical therapy as a result of her cardiac event. (*Id.* at 576.) Dr. Fox expressed doubt regarding the myocardial infarction diagnosis but noted that Champion was being treated for coronary artery disease, diabetes mellitus, occasional headaches, chronic lower back pain, and major depression. (*Id.* at 579-80.)

Champion returned to Dr. Fox on January 16, 2013. (Tr. at 572-75.) She was reportedly "tearful" and "very upset," and she informed Dr. Fox that she was being evicted. (*Id.* at 572.) She also indicated that she was still suffering from chest pain and occasional headaches. *Id.* With regard to her myocardial infarction, she stated that was never catheterized and did not have a follow-up stress test. *Id.* Dr. Fox indicated that her symptoms of coronary artery disease seemed "very somatic" but that he did not have complete documentation of the alleged myocardial infarction and that Champion would have to return to the emergency room for further evaluation. (*Id.* at 573.)

Champion returned to Dr. Fox on February 20, 2013. (*Id.* at 567-71.) Dr. Fox observed that Champion had elevated blood pressure because she had run out of her medication; that her back pain was still bothering her and that she would need clearance from her cardiologist to resume physical therapy; that she remained obese; and that she had been suffering from left ear pain for the past several weeks. (*Id.* at 567.) Dr. Fox indicated that Champion was being treated for otitis externa, diabetes mellitus, hypertension, chronic lower back pain, and coronary artery disease. (*Id.* at 570.) Dr. Fox expressed uncertainty as to why Champion was suffering recurrent ear infections but noted that it could be a result of previously uncontrolled diabetes mellitus. *Id.* Dr. Fox also noted that Champion's A1C blood levels were at goal but that she should continue taking her medication; that her blood pressure was elevated and that Dr. Fox would refill Champion's medication before increasing her dosage; that she should resume physical therapy for her lower back once she received clearance from her cardiologist; and that her ongoing chest pain was very atypical and did not warrant additional testing, though she had an upcoming cardiology appointment. *Id.*

Champion returned to Dr. Fox on March 6, 2013, reporting that her cardiologist confirmed there was no acute myocardial infarction. (Tr. at 562-66.) Additionally, Champion informed Dr. Fox that her blood pressure was at goal; that she was meeting with Dr. Dowling for talk therapy and Champion was feeling a bit better; that she was out of the shelter and living with family; that she was considering bariatric surgery for her obesity although she had lost some weight with diet and exercise; and that her left ear was still bothering her. (*Id.* at 562.) Dr. Fox described Champion as being "well-developed, well-nourished, and in no acute distress." (*Id.* at 564.) Dr. Fox also observed that Champion's tympanic membrane was clear; that her lungs were "clear to auscultation" without crackles, rhonchi, or wheezing; and that her heartrate and rhythm were regular. *Id.* Dr. Fox noted that Champion was being treated for ear pain, morbid obesity, diabetes mellitus, hypertension, and major depression. (*Id.* at 564-65.) Dr. Fox observed no external problems with Champion's left ear; discussed the pros and cons of bariatric surgery with her; updated her diabetes mellitus medications and requested another blood test; and recommended that she continue taking hypertension medication and attending talk therapy. *Id.*

Champion returned to Dr. Fox on May 8, 2013, at which point Dr. Fox noted that Champion's asthma and blood pressure were both controlled. (*Id.* at 550-61.) Dr. Fox indicated that Champion was being treated for diabetes mellitus, non-cardiac chest pain, chronic asthma, and hypertension. (*Id.* at 553.) After consulting Champion's May 3 blood test results, (*Id.* at 674-75.), Dr. Fox noted that Champion's diabetes mellitus and asthma were mild and advised her to wean off of her hypertension medication. (*Id.* at 533.)

Champion returned to Dr. Fox on July 3, 2013. (*Id.* at 544-49.) Champion reported that she had strained her back during work training two weeks prior and that she was still suffering from back pain, right ankle pain, and intermittent chest pain. (*Id.* at 544.) Dr. Fox indicated that

Champion was being treated for diabetes mellitus, morbid obesity, chronic lower back pain, osteoarthritis, and hypertension. (Tr. 546-47.) Dr. Fox noted that Champion's diabetes mellitus was well-controlled and decreased her medication to once a day; discussed pros and cons of weight loss surgery; recommended that Champion resume physical therapy; noted that Champion wanted to return to the orthopedist again regarding her osteoarthritis; suggested she go for a mammogram; and increased her hypertension medication. *Id.*

Champion returned to Dr. Fox on September 25, 2013, reporting that she had recently been hospitalized again for shortness of breath and palpitations/chest pain but indicating that the episode was from reflux. (*Id.* at 532-38.) Champion also stated that she was meeting with Dr. Dowling and learning techniques to control her panic attacks; that she was not taking several of her hypertension medications; and that she continued to have pain in her back, shoulders, and knees, despite taking Aleve and Tylenol. (*Id.* at 533.) Dr. Fox described her as "teary-eyed" and observed that Champion's lungs were "clear to auscultation" without crackles, rhonchi, or wheezing; that her heart rate and rhythm were regular without murmurs, rubs, or gallops; and that her blood pressure was high. (*Id.* at 535.) Dr. Fox noted that Champion was being treated for non-cardiac chest pain, morbid obesity, diabetes mellitus, hypertension, anemia, and chronic lower back pain. (*Id.* at 535-36.) Dr. Fox reminded Champion that she did not have heart disease and suggested she consider anti-anxiety medication; commented that weight loss may reduce chronic pain and that Champion would be a good candidate for surgery if her blood pressure improved; noted that she has not been taking her diabetes medication; recommended that she restart Dyazide for her hypertension; and added Nortriptyline for anxiety/panic and chronic back pain. *Id.*

Champion returned to Dr. Fox on November 23, 2013, for a follow-up visit. (Tr. at 522-26.) Champion reported that she had visited the emergency room a total of three times because of her asthma but that she hadn't needed to use her albuterol inhaler since being discharged. (*Id.* at 522.) She added that her stress levels had decreased and that she was working and feeling happier, though still dealing with some housing issues. *Id.* Dr. Fox observed that Champion was "well-developed, well-nourished, and in no acute distress"; that her lungs were "clear to auscultation" without crackles, rhonchi, or wheezing; and that her blood pressure was 133/87mm Hg. (*Id.* at 523.) Dr. Fox recommended a controller medication for Champion's asthma because of her frequent emergency room visits; noted that Champion was seeing the bariatric surgery team; and discussed Champion's frequent somatic symptoms and how over utilization of imaging/tests could lead to false positives. (*Id.* at 524.)

### (2) Dr. Clyde Smith, MD

On June 28, 2011, Champion met with Dr. Clyde Smith, MD for a PPD Testmultiple tests for Tuberculosis, Measles, Mumps, Rubella, Varicella, Syphilis, Hepatitis B, Hepatitis C, and Hepatitis A in order to complete her medical/physical forms for a Daycare job application and for her hair-cutting license. (*Id.* at 621, 778.) Dr. Smith noted that Champion had no history of contact with active tuberculosis. *Id.*

### (3) Dr. Swana De Gijsel, MD

On October 26, 2011, Champion visited Dr. Swana De Gijsel ("Dr. Gijsel") with complaints of a headache that had been intermittent over the course of the past year. (*Id.* at 612, 769.) Dr. Gijsel observed headache, hypertension, and otitis externa. (*Id.* at 614-15, 771-72.) Dr. Gijsel noted that given the long duration of Champion's headache, its responsiveness to pain medications, and Champion's lack of other neurological symptoms, the headache was unlikely to

have a serious underlying cause and was most likely tension- or sinus-related. (Tr. at 614, 771.)
Dr. Gijsel also observed that the pharmacy had given Champion 300mg of labetalol for her
hypertension instead of the prescribed 200mg and noted that she would inform the pharmacy of
the error, adding that the higher dose may explain Champion's dizziness. (*Id.*) Dr. Gijsel
prescribed Champion with ear drops for her otitis externa. (*Id.* at 615, 772.) Dr. Gijsel
instructed Champion to follow-up with Dr. Fox on November 6, 2011. (*Id.* at 614, 771.)

### (4) Dr. Erin Goss, MD

On August 29, 2012, Champion visited Dr. Erin Goss ("Dr. Goss"). (*Id.* at 599.)
Champion reported lower back pain and knee pain and requested an MRI. *Id.* Dr. Goss noted
that Champion was a "frustrated woman" with obesity and no acute distress. (*Id.* at 600.) Dr.
Goss stated she would speak with Dr. Fox regarding an MRI and recommended yoga. *Id.*

Champion returned to Dr. Goss on September 6, 2012. (*Id.* at 596.) Champion
complained of a skin rash caused by a mosquito bite and pain in her right thumb and wrist. *Id.*
Dr. Goss diagnosed Champion with de Quervain's tenosynovitis of the right wrist and
recommended Champion apply ice, cortisone cream, and nonsteroidal anti-inflammatory drugs to
the area. (*Id.* at 597.) Dr. Goss indicated that she could refer Champion to an orthopedic
physician if her symptoms had not improved in a month. *Id.* Dr. Goss also recommended
bacitracin ointment for Champion's rash. *Id.*

### (5) Dr. Gregory Mints, MD

On November 6, 2012, Champion made an emergent visit to Lincoln Medical Center for
non-cardiac chest pain and treated with attending physician Dr. Gregory Mints ("Dr. Mints.")
(Tr. at 431-99.) Dr. Mints gave Champion a primary diagnosis of NSTEMI and a secondary
diagnosis of hypertension, type two diabetes mellitus, and asthma. (*Id.* at 433.) However, after

reviewing Champion's myocardial perfusion scans, Dr. Mints ruled out coronary artery disease, noting that Champion's left ventricle was mildly enlarged in size but that there was no myocardial perfusion defect to suggest myocardial ischemia. (*Id.* at 444.) He noted that her attack was "most likely non-cardiac [chest pain] with [troponin] elevation of unclear significance." (*Id.* at 459.) Dr. Mints advised Champion to follow up with her primary care physician, Dr. Fox, in one week. (*Id.*) Champion was discharged on November 10, 2012. (*Id.* at 433.)

### (6) Dr. Melissa Amy Bender, MD

On October 7, 2013, Champion visited Dr. Melissa Amy Bender ("Dr. Bender") for an upper respiratory infection. (*Id.* at 527-31.) Dr. Bender noted that Champion was being treated for an upper respiratory infection, hypertension, and edema of the legs. (*Id.* at 529-30.) Dr. Bender recommended rest, fluids, steam, and albuterol inhaler as needed for the upper respiratory infection and suggested that Champion follow up with Dr. Fox regarding her hypertension and edema. *Id.*

### (7) Dr. Jenny Choi, MD

On September 12, 2013, Champion presented to Dr. Jenny Choi ("Dr. Choi") for an initial visit regarding bariatric surgery. (*Id.* at 658-62.) Champion reported that she had been overweight for more than five years and had failed conservative management of her diet and exercise. (*Id.* at 658.) Dr. Choi recommended Champion start a regular exercise program and encouraged her to lose weight. (*Id.* at 661.) Champion returned to Dr. Choi for follow-up visits on October 4 and November 26, 2013. (Tr. at 637-38, 649-50.) Dr. Choi counseled Champion on nutrition and encouraged her to continue healthy eating and exercise habits. (*Id.* at 641, 654.) Champion underwent a blood test, as instructed by Dr. Choi, on January 23, 2014. (*Id.* at 676.)

### b. Consultative Opinions

#### (1) Dr. Barbara Akresh, MD

On December 27, 2012, Champion saw a one-time consultative examiner, Dr. Barbara Akresh ("Dr. Akresh"), at the behest of the Social Security Administration. (*Id.* at 500-06.) With regard to her activities of daily living, Champion informed Dr. Akresh that Champion needs her sister and daughter to cook and clean for her; that she requires assistance when doing laundry and grocery shopping; and that her daughter helps her wash her back when she showers and sometimes helps her put on a bra when she gets dressed. (*Id.* at 502.) Dr. Akresh noted that Champion was being treated for her history of asthma, history of chest pain, history of chronic lower back pain, history of hypertension, and status-post multiple arthroscopic surgeries. (Tr. at 504-05.) After performing an examination, Dr. Akresh concluded that Champion possessed "mild limitations in her ability to perform strenuous activity" and recommended a psychiatric evaluation. (*Id.* at 505.)

#### (2) Raymond E. Cestar, Vocational Expert

Vocational expert Raymond E. Cestar ("Cestar") testified at the ALJ hearing on April 23, 2014. (*Id.* at 58, 105.) Cestar stated that Champion's past work was as a mail clerk, office manager, surveillance system monitor, and security guard, which are classified as "sedentary" jobs. (*Id.* at 115.) Cestar stated that if a person could only stand and walk for five hours total per eight-hour workday; sit for six hours per eight-hour workday; occasionally operate foot controls; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally stoop, crouch, kneel, and crawl; frequently reach; never be exposed to bronchial irritants; and be off task five percent of the work period, she would be able to perform Champion's past work. (Tr. at 115-16.)

Cestar also testified that if an individual had the aforementioned limitations except she could only stand and walk for two hours and sit for six hours per eight-hour workday, she would be able to perform Champion's past work as an office manager. (*Id.* at 117.) Cestar further testified that in the current market, "more than one unexcused absence per month would be considered excessive," and being off task for "ten percent or more [of the work period] would be considered excessive." (*Id.* at 118.)

### 3. The ALJ's Findings

On November 10, 2014, ALJ Penalver issued a decision finding that Champion was not disabled within the meaning of the Act, and had not been disabled since May 14, 2010. (*Id.* at 44.) Following the five-step analysis, ALJ Penalver first found that Champion had not engaged in substantial gainful activity during the period at issue. (*Id.* at 35.) The ALJ then concluded that Champion had five severe impairments: lumbar osteoarthritis with a history of lower back pain; status-post bilateral knee surgery; right shoulder tear; asthma; and obesity. (*Id.* at 36.) He found that Champion did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 ("the listings"). (*Id.* at 38.) ALJ Penalver found that Champion retained the RFC to perform light work, specifying certain limitations. (*Id.* at 39.) He found that Champion was capable of performing her past relevant work as a surveillance system monitor, security guard, and office manager, which do not require the performance of work-related activities precluded by her RFC. (*Id.* at 44.) ALJ Penalver, therefore, denied Champion's claim. *Id.*

At step two, the ALJ found five of Champion's impairments to be severe, in that they have lasted "for a continuous period of more than 12 months and have caused more than a minimal effect on [Champion's] ability to perform basic work activities." (Tr. at 36.) The ALJ

found the following physical impairments to be non-severe: diabetes mellitus, hypertension, and an associated non-cardiac episode of chest pain. *Id.* With regard to Champion's medical impairment of unspecified mood disorder with a depressed mood and panic attacks, ALJ Penalver noted that "there are no treating psychological or psychiatric function opinions in the record, and although [Champion] has testified that she is depressed and anxious since the alleged onset date, she has still had the mental acumen to pursue and obtain a Bachelor's degree, as well as obtain (and perform) two separate jobs." (*Id.* at 38.) The ALJ stated that Champion had "no restriction in the activities of daily living, no difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation." *Id.*

The ALJ based this finding on the evidence that Champion's diabetes mellitus had responded favorably to medication and treatment and was ultimately diagnosed as both mild and controlled, (*Id.* at 36.); that her hypertension reportedly improved when she complied with her medication regimen, (*Id.* at 36, 360.); that her myocardial infarction was later diagnosed as non-cardiac chest pain, (*Id.* at 444.); that a subsequent hospitalization due to chest pain was likely panic-related, (*Id.* at 37.); that Dr. Fox had diagnosed her with depression but that she reported improvement after starting talk therapy, (*Id.* at 37.); that there were no psychological treatment notes to support her contention that she was treating for depression, (*Id.* at 37.);[4] that Champion reported not being in compliance with her antidepressant medication regimen and was never prescribed selective serotonin reuptake inhibitors, (*Id.* at 37.); and the determination that her inconsistency in attending sessions, receipt of a bachelor's degree, and performance of two

---

[4] The ALJ, however, also states that there is evidence that Champion was receiving treatment for depression and was improving, which demonstrates that the ALJ was on notice that he did not have all of the necessary evidence. (Tr. at 37.)

separate jobs indicated that her depression does not interfere with her day to day functioning, (*Id.* at 37-38.). ALJ Penalver therefore concluded that the evidence failed to establish that these impairments "have had greater than a slight or minimal effect on her ability to perform basic work activities, and thus, these are non-severe impairments." *Id.*

At step three, the ALJ concluded that although Champion's lumbar osteoarthritis, status-post bilateral knee surgery, right shoulder tear, asthma, and obesity were severe, the medical evidence did not establish the requisite evidence of any of the impairments under listings 1.02, 1.04, and 3.03. (*Id.* at 38-39.) With regard to Champion's right shoulder and bilateral knee impairments, the ALJ concluded that evidence failed to meet the qualification under Listing 1.02, Major Dysfunction of a Joint. (*Id.* at 38.) With regard to Champion's lumbar osteoarthritis, the ALJ concluded that evidence failed to meet the qualification under Listing 1.04, Disorders of the Spine. *Id.* With regard to Champion's asthma, the ALJ concluded that evidence failed to meet the qualification under Listing 3.03, Asthma. (*Id.* at 39.) With regard to Champion's obesity, the ALJ noted that there are no Listing criteria in Appendix 1 specific to the evaluation of obesity but that obesity was nonetheless considered in determining whether Champion's impairments met or equaled any listing section. *Id.*

At step four, the ALJ found that Champion had the RFC to perform light work with the following limitations:

> [Champion] can only stand 5 hours per 8-hour workday and sit for approximately 6 hours per workday. Moreover, she is limited to occasional bilateral foot control operation; she can never climb ladders, ropes or scaffolds; she can occasionally climb ramps or stairs; and she can occasionally stoop, crouch, kneel, and crawl. With the dominant right upper extremity, [Champion] is limited to frequent reaching and occasional overhead reaching; and she must avoid concentrated and frequent exposure to bronchial irritants such as noxious fumes, odors, dust, gases and chemicals. Finally, [Champion] would be off task 5% of the work period.

(Tr. at 39.)

Although the ALJ acknowledged that Champion's impairments "could reasonably be expected to cause the alleged symptoms," he concluded that her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible." (*Id.* at 42.) The ALJ cited several of Champion's allegations that he found inconsistent with the record, such as her testimony that her lower back pain interferes with her current job duties, noting that since her alleged onset date, she has pursued and obtained a college degree; applied for and collected more than one year of unemployment benefits and certified that she was ready, willing, and able to work; had two full-time jobs since August 2013; and returned to work after the initial 2003 motor vehicle accident that caused her to require multiple muscoskeletal surgeries. (Tr. at 42.) The ALJ concluded that "nothing in the medical evidence of record shows that [Champion] is precluded from performing mental or physical related work activities." (*Id.* at 43.)

The ALJ gave "great weight" to the consultative opinion of Dr. Akresh because her opinion was "supported by a record showing that while [Champion's] muscoskeletal and asthma impairments can be controlled with medication and treatment, she does have chronic conditions that would preclude her from performing a range of medium or heavy exertional work activities." *Id.* The ALJ noted that, despite Champion's chronic conditions, her current job is performed using light exertion, "which also supports Dr. Akresh's opinion that [Champion] would be limited from performing strenuous exertion since she currently performs only light exertional activities." *Id.*

In his decision, the ALJ referred to the records of Champion's treating physician, Dr. Fox. The ALJ's decision, however, does not reflect what weight, if any, he assigned to Dr. Fox's medical opinions. (Tr. at 43.) With respect to psychological medical assessments, the ALJ

stated that "there are no treating psychological or psychiatric function opinions in the record." (*Id.* at 38.)

## C.    Appeals Council Review

Champion requested review by the Appeals Council following receipt of the ALJ's decision, (Tr. at 23.), and submitted additional medical evidence. (*Id.* at 317-18.) First, Champion submitted a Treating Physician's Wellness Plan Report from Dr. Dowling, dated December 22, 2014, in which Dr. Dowling listed Champion's symptoms as depressed mood, irritability, sleep disturbance, flashbacks, avoidance of stimuli associated with traumatic events, and anxiety attacks. (*Id.* at 27-28.) Dr. Dowling diagnosed Champion with depressive disorder, panic disorder without agoraphobia, and post-traumatic stress disorder. (*Id.* at 27.) Dr. Dowling noted that Champion had developed some coping skills when beginning to feel irritable or agitated and that she was receptive to further work to improve her emotional and psychological health. *Id.* According to Dr. Dowling, "[Champion] continues to have difficulty managing her work, tends to become irritable in response to interpersonal discord, experiences panic symptoms, [has] difficulty trusting others, [and her] communication abilities [are] compromised." (*Id.* at 28.) Dr. Dowling concluded that Champion was unable to work for at least twelve months and that she might be eligible for long term disability benefits. *Id.*

Second, Champion submitted progress notes from Dr. Fox, between May 3, 2014, and November 1, 2014. (*Id.* at 630-36, 677-83, 790-801.) Champion visited Dr. Fox on May 3, 2014, for severe shoulder and back pain, heart burn, a swollen foot, and stress. (*Id.* at 630, 677, 790.) Dr. Fox described Champion as "distressed" and "anxious." (*Id.* at 633, 680, 793.) Dr. Fox observed trace edema on Champion's right shoulder, anterior shoulder pain, and inability to elicit a knee jerk. *Id.* Dr. Fox also noted that Champion was being treated for chronic lower

back pain, shoulder pain, major depression, gastroesophageal reflux disease ("GERD"), and hypertension. (*Id.* at 634, 681, 794.) Dr. Fox recommended that Champion continue daily Tylenol or Naproxen for her back pain and suggested weight loss. (Tr. at 634, 681, 794.) Dr. Fox also noted that Champion's shoulder pain was likely acromioclavicular ("AC joint") arthritis and recommended Tylenol and stretching. *Id.* Dr. Fox did not alter Champion's hypertension dosage because she had not been taking her meds. *Id.*

During her visit on May 31, 2014, Champion reported that she had stopped taking her antidepressants because they were giving her insomnia but that talk therapy was helping. (*Id.* at 314, 797.) She also indicated that her blood pressure had improved and that she was no longer experiencing chest pain. *Id.* Champion stated that she was still suffering from back pain, which had caused her to leave work the previous Friday. *Id.* Dr. Fox documented the exacerbation of back pain and recommended rest and medication, concluding that Champion would be able to return to work on the following Monday. (*Id.* at 314.) Dr. Fox observed that Champion was "well-developed, well-nourished, and in no acute distress"; that she had a full range of motion without point tenderness; and that her gait was normal. (*Id.* at 799.) Dr. Fox indicated that he was treating Champion for chronic lower back pain, major depression, and allergic rhinitis. *Id.* Dr. Fox explained the risks and benefits of antidepressants and instructed Champion to take anti-histamines for seasonal allergies. *Id.*

In a letter from Dr. Fox dated June 11, 2014, Dr. Fox listed Champion's illnesses as chronic lower back pain, chronic shoulder pain, osteoarthritis of the knee, asthma, and major depressive disorder. (*Id.* at 312.) Dr. Fox noted that despite trying multiple treatment modalities for her back, Champion's chronic pain continued to limit her ability to perform in a competitive

work environment. *Id.* Dr. Fox indicated that her depression also limits her ability to perform her job duties. *Id.*

Third, Champion submitted a Biosocial Summary Report from FEGS WeCare Representative Yailemys Ponce, dated August 20, 2014. (*Id.* at 802-45.) Champion's mental health profile indicated that her medical provider and psychiatrist had both diagnosed her with major depressive disorder and that her symptoms included suicidal ideation and violent behavior towards others. (*Id.* at 809-10.)

Champion also met with Ponce on Janaury 15, 2015. (*Id.* at 15-22.) With regard to Champion's activities of daily living, Ponce noted:

> [Champion's] mental and medical conditions stop her from being able to function well in positions where she must deal with people (violent) or complete manual labor. Her lack of sleep due to racing thoughts and pain affect her ability to complete [activities of daily living], marked difficulties in social functioning, concentration, persistence and pace.

(*Id.* at 15.)

Ponce summarized that Champion was receiving benefits from HRA and had no substantial gainful activity; was unable to perform activities of daily living and concentration and pace due to marked limitations; had impairments matching SSA listing 12.04, affective disorders; was reported unable to perform any new work by Dr. Fox and Dr. Dowling; and that due to her lack of residual functional capacity ("RFC"), age, education, work experience, and medication side effects, Dr. Dowling documented Champion's inability to perform any past or new employment for at least 12 months. (*Id.* at 22.)

The Appeals Council denied review on May 9, 2016, and the ALJ's decision became the final decision of the Commissioner. (Tr. at 1.)

20

# III.    DISCUSSION

## A.  Standard of Review

Upon judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"  42 U.S.C. §§ 405(g), 1383(c)(3).  Therefore, a reviewing court does not determine *de novo* whether a claimant is disabled.  *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (*citing Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); *accord Mathews v. Eldridge*, 424 U.S. 319, 339 n.21 (1976) (citing 42 U.S.C. § 405(g)).  Rather, the court is limited to "two levels of inquiry."  *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir, 1987).  First, the Court must determine whether the Commissioner applied the correct legal principles in reaching a decision.  42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson*, 817 F.2d at 986); *accord Brault*, 683 F.3d at 447.  Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record.  42 U.S.C. § 405(g).  If the Commissioner's decision meets both of these requirements, the reviewing court must affirm; if not, the court may modify or reverse the Commissioner's decision, with or without remand.  *Id.*

An ALJ's failure to apply the correct legal standard constitutes reversible error, provided that the failure "might have affected the disposition of the case."  *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)); *accord Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008).  This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR").  *See, e.g., Kohler*, 546 F.3d at 265 (regulation); *Schaal v. Callahan*, 933 F. Supp. 85, 93 (D. Conn. 1997) (SSR).  In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair

record to explain his reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418 (N.D.N.Y. 2008) (citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord Brault*, 683 F.3d at 447-48. The substantial evidence standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis added).

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i). The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which it is based." 42 U.S.C. §§ 405(b)(1). While the ALJ's decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. *See Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008)

(overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 Civ. 1120 (DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409 (reconsideration of improperly excluded evidence typically requires remand). Eschewing note analysis and conclusory explanations, the ALJ must discuss "the crucial factors in any determination …with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

## B. Determination of Disability

### 1. Evaluation of Disability Claims

Under the Social Security Act, every individual considered to have a "disability" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* at §§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905. A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505, 416.905.

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step inquiry: (1) determine whether the claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the claimant has a "severe impairment" that significantly limits his or her ability to do basic work

activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the regulations – if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether the claimant possesses the RFC to perform his past work despite the disability; and (5) if not, determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999). While the claimant bears the burden of proving disability at the first four steps, the burden shifts to the Commissioner at step five to prove that the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012).

The ALJ may find a claimant to be disabled at either step three or step five of the Evaluation. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step three, the ALJ will find that a disability exists if the claimant proves that his or her severe impairment meets or medically equals one of the impairments listed in the regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant fails to prove this, however, then the ALJ will complete the remaining steps of the Evaluation. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(5), 416.920(e), 416.945(a)(5).

A claimant's RFC is "the most [she] can still do despite [her] limitation." 20 C.F.R. §§ 404.1545(a), 416.945(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-9P (clarifying that a claimant's RFC is her maximum ability to perform full-time work on a regular and continuing basis). The ALJ's assessment of a claimant's RFC must be based on "all relevant medical and other evidence," including objective medical evidence, such as x-rays and MRIs; the opinions of treating and consultative physicians; and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty

performing daily activities. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)); *see also* 20 C.F.R. §§ 404.1512(b), 404.1528, 404.1529(a), 404.1545(b).

In evaluating the claimant's alleged symptoms and functional limitations for the purposes of steps two, three, and four, the ALJ must follow a two-step process, first determining whether the claimant has a "medically determinable impairment that could reasonably be expected to produce [her alleged] symptoms." 20 C.F.R. §§ 404.1529(b), 416.929(b); *Genier*, 606 F.3d at 49. An ALJ should not consider whether the severity of an individual's alleged symptoms is supported by objective medical evidence. Social Security Ruling ("SSR") 16-3P, 2016 WL 1119029, at *3. Second, the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c); see also 20 C.F.R. § 416.929(c); *Genier*, 606 F.3d at 49. The ALJ must consider the entire case record, including objective medical evidence, a claimant's statements about the intensity, persistence, and limiting effects of symptoms, statements and information provided by medical sources, and any other relevant evidence in the claimant's record. SSR 16-3P, 2016 WL 1119029, at *4-6. The evaluation of a claimant's subjective symptoms is not an evaluation of that person's character. *Id.*, at *1.

Although the regulations have not been altered, the Commissioner issued a new Social Security Ruling, S.S.R. 16-3p, in March of 2016. The purpose of this ruling is to provide "guidance about how [to] evaluate statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims." S.S.R. 16-3P, 2016 WL 1119029, at *1. The Ruling supersedes the 1996 Ruling, S.S.R. 96-7p, which placed a stronger emphasis on the role of the adjudicator to make a "finding about the credibility of the individual's statements about the symptom(s) and its functional effects." S.S.R. 96-7P, 1996 WL 374186, at *1. In contrast,

S.S.R. 16-3p espouses a more holistic analysis of the claimant's symptoms, and "eliminate[s] the use of the term 'credibility'" for sub-regulation policy. S.S.R. 16-3P, 2016 WL 1119029, at *1. The Commissioner notes that the "regulations do not use this term," and by abandoning it, "clarif[ies] that subjective symptom evaluation is not an examination of an individual's character." *Id.* This corrected approach closely adheres to the regulatory language of the Act, shifting the focus to the evaluation of the intensity and persistence of the claimant's symptoms, not the undermining claimant's character.

In making the determination of whether there is any other work the claimant can perform, the Commissioner has the burden of showing that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Charter*, 142 F.3d 75, 80 (2d Cir. 1998) (citation omitted).

### 2. The Treating Physician Rule

The SSA regulations require the Commissioner to evaluate every medical opinion received. *See* 20 C.F.R. § 404.1527(c); *see also Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993). The opinion of a claimant's treating physician is generally given more weight than the opinion of a consultative or non-examining physician because the treating physician is likely "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (discussing the "treating physician rule of deference"). A treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir. 2015) ("SSA regulations provide a very specific process for evaluating a treating physician's

opinion and instruct ALJs to give such opinions 'controlling weight' in all but a limited range of circumstances.").

If the treating physician's opinion is not given controlling weight, the Commissioner must nevertheless determine what weight to give it by considering: (1) the length, nature, and frequency of the relationship; (2) the evidence in support of the physician's opinion; (3) the consistency of the opinion with the records as a whole; (4) the specialization of the physician; and (5) any other relevant factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i)–(ii); *Schisler*, 3 F.3d at 567-69. The Commissioner may rely on the opinions of other physicians, even non-examining ones, but the same factors must be weighed. 20 C.F.R. §416.927(e).

The ALJ is required to explain the weight ultimately given to the opinion of a treating physician. See 20 C.F.R. § 404.1527(c)(2) ("We will always give good reason in our notice of determination or decision for the weight we give your treating source's opinion.") Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Greek*, 802 F.3d at 375 (citing *Burgess*, 537 F.3d at 129); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). Reasons that are conclusory fail the "good reasons" requirement. *Gunter v. Comm'r of Soc. Sec.*, 361 Fed. Appx. 197, 199-200 (2d Cir. 2012) (findings reversible error where an ALJ failed to explain his determination not to credit the treating physician's opinion). The ALJ is not

permitted to arbitrarily substitute his own judgement of the medical proof for the treating physician's opinion. *Balsamo*, 142 F.3d 81.

Furthermore, an ALJ "cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record," especially where the claimant's hearing testimony suggests that the ALJ is missing records from a treating physician. *Burgess*, 537 F.3d at 129 (quoting *Rosa*, 168 F.3d at 79); *Rosado v. Barnhart*, 290 F. Supp. 2d 431, 438 (S.D.N.Y. 2003) ("[A] proper application of the treating physician rule mandates that the ALJ assure that the claimant's medical record is comprehensive and complete."). Similarly, "if an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly." *Hartnet v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998), *accord Rosa*, 168 F.3d at 79.

Finally, the ALJ must give advance notice to a *pro se* claimant of adverse findings. *Snyder v. Barnhart*, 232 F. Supp. 2d 542, 545 (S.D.N.Y. 2004) (citing *Infante v. Apfel*, No. 97 Civ. 7689 (LMM), 2001 WL 536930, at *6 (S.D.N.Y. May 21, 2001)). This allows the *pro se* claimant to "produce additional medical evidence or call [her] treating physician as a witness." *Brown v. Barnhard*, 02 Civ. 4523 (SHS), 2003 WL 1888727, at *7 (S.D.N.Y. April 15, 2003) (citing *Santiago v. Schweiker*, 548 F. Supp. 481, 486 (S.D.N.Y. 1981)).

### 3. The Commissioner's Duty to Develop the Record

The ALJ generally has an affirmative obligation to develop the administrative record. 20 C.F.R. § 404.1512(d); *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) ("Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]"). Under the Act, the ALJ must "make

every reasonable effort to obtain from the individual's treating physician … all medical evidence, including diagnostic tests, necessary in order to properly make" a determination of disability. 42 U.S.C. § 423(d)(5)(B). Furthermore, when the claimant is unrepresented by counsel, the ALJ "has a duty to probe scrupulously and conscientiously into and explore all relevant facts … and to ensure that the record is adequate to support his decision." *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir, 1999), citing *Dechirico v. Callahan*, 134 F.3d 1177, 1183 (2d Cir. 1998); *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999); *Pratts v. Chater*, 94 F.3d 34, 37-38 (2d Cir. 1996). Remand to the Commissioner is appropriate when there are "obvious gaps" in the record and the ALJ has failed to seek out additional information to fill those haps. *See Lopez v. Comm'r of Soc. Sec.*, 622 Fed. Appx. 59 (2d Cir. N.Y. 2015), citing *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999).

## C. Issues on Appeal

Champion argues several bases for remand to the Commissioner: the ALJ (1) failed to fully and fairly develop the record concerning Champion's mental health impairments; (2) failed to consider new and material evidence submitted at the Appeals Council level; and failed to properly consider plaintiff's credibility.[5] (Doc. No. 17.) The Commissioner argues that her decision is "legally correct and supported by substantial evidence." (Doc. No. 19 at 14.)

Having considered the Parties' arguments and the record as a whole, the Court recommends remand for further development of the administrative record.

---

[5] Although it appears that the ALJ did not assign weight to all of Champion's treating physicians and only appears to assign "great weight" to consultative physician Dr. Akresh, (Tr. at 43.), this issue is not raised by Champion and will not be reached herein.

### 1. The ALJ Did Not Satisfy His Duty to Develop the Record

Champion argues that ALJ Penalver erred in finding that her mental health impairments were non-severe, arguing that the ALJ failed to take action to develop the record despite being fully aware that he did not possess Champion's psychotherapy treatment notes. (Doc. No. 17. at 12-13.) A severe impairment is one that "significantly limits an individual's physical or mental ability to do basic work activities." 20 C.F.R § 404.1521(b)(4-6). An impairment is not severe if the "medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." S.S.R. 85-28, 1985 WL 56856, at *2 (quoting *Brady v. Heckler*, 724 F.2d 914, 919-20 (11th Cir. 1984). Given that Champion was *pro se* at both the time of the hearing and the ALJ's decision, the Second Circuit places a heightened burden on the Commissioner to fully and fairly develop the record. *Moran v. Astrue*, 569 F.3d 108, 110 (2d Cir, 2009) (relying on *Cruz v. Sullivan*, 912 F.2d 8 (2d Cir. 1990)).

Social security regulations set forth the techniques used "at each level in the administrative review process" to evaluate mental impairments. 20 C.F.R. §404.1520a. The ALJ must rate the degree of a claimant's functional impairments in each of four areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3) (referencing 20 C.F.R., Part 404, Subpart P, App'x 1 § 12.00C). The degree of limitation in the first three areas is rated using a five-point scale: none, mild, moderate, marked, and extreme. *Id.* at § 404.1520a(c)(4). A four-point scale is used to measure episodes of decompensation: none, one or two, three, four or more. *Id.* If the claimant's degree of limitation in the first three functional areas is rated as "none" or "mild," and "none" in the fourth area, the ALJ "will generally conclude that [the] impairment(s)

is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities[.]" *Id.* at § 404.1520a(d)(1), citing *Id.* § 404.1521.

In October of 2012, Champion's primary care physician, Dr. Fox, indicated that Champion might be suffering from major depression, observing that she was "very irritable" and exhibited "dysphoric mood" and "weight gain." (Tr. at 591.) Dr. Fox referred Champion to Dr. Dowling for talk therapy and coping skills. *Id.* Champion underwent a psychiatric evaluation with Dr. Dowling on September 16, 2014, during which Dowling noted symptoms such as variable appetite, decreased concentration and motivation, anhedonia, occasional depressed mood, difficulty sleeping, anxiety attacks, frequent worry and irritability, flashbacks and nightmares. (*Id.* at 784.)

Dr. Dowling diagnosed Champion with major depressive disorder, panic disorder without agoraphobia, and posttraumatic stress disorder. (*Id.* at 784.) During the hearing, Champion testified that she suffers from frequent panic or anxiety attacks that last anywhere from "an hour or two" to "about a week or so." (*Id.* at 89, 91.) When the ALJ asked what triggered these attacks, Champion replied, "being closed in," "stress," and "it could be anything." *Id.* Champion testified that these attacks often occur while she is at work because her work is "very stressful," adding that "nobody knows about it, because I go in the bathroom." (*Id.* at 90.) At the conclusion of the hearing, Champion testified that being injured "puts me in a place where I isolate myself" and "[makes] me very depressed, because it's like my life is just passing by…. I don't do anything anymore. So it's like I don't even have a social life." (*Id.* at 122.)

At the time of the hearing, ALJ Penalver was made aware that Champion was seeing Dr. Dowling[6] for mental health impairments and that Champion was taking medication for her mental health conditions. (*Id.* at 91.) Realizing he had no medical evidence, the ALJ made an attempt to develop the record by issuing a subpoena to Dr. Dowling on March 31, 2014, prior to Champion's hearing. (*Id.* at 518.) On April 4, 2014, Montefiore responded by providing more than 100 pages of medical records, all of which pertained to Champion's medical conditions and treatment by Dr. Fox. (Tr. at 514-628.) ALJ Penalver made a second request for psychiatric records on May 14, 2014, specifying that Champion's allegations included depression. (*Id.* at 629.) Montefiore responded with another set of records through May 2014, but again, only reflected Champion's medical treatment with Dr. Fox. (*Id.* at 630-780.)

Champion subsequently submitted a letter from Dr. Fox indicating that her mental health conditions limited her ability to perform her job duties, as well as a letter from her employer threatening to take disciplinary action in response to her chronic absenteeism. (*Id.* at 311-13.) Champion also noted that the record was still missing her psychotherapy treatment notes. (*Id.* at 311.) Subsequently, Champion submitted a post-hearing progress note from Dr. Dowling dated September 16, 2014, on the cover of which she wrote, "this is the rest of my medical work." (*Id.* at 781.)

The ALJ's duty to develop the record is enhanced when the disability in question is a psychiatric impairment. *Lacava v. Astrue,* No. 11-CV-7727 WHP SN, 2012 WL 6621731, at *11-12 (S.D.N.Y. Nov. 27 2012), *report and recommendation adopted*, No. 11 CIV. 7727 WHP, 2012 WL 6621722 (S.D.N.Y. 2012). The Commissioner argues that because Champion stated that her September 16, 2014 progress note was the last of her psychiatric records, ALJ Penalver

---

[6] The transcript incorrectly identifies Champion's treating psychological source as "Dr. Downey." (Tr. at 91.)

had no reason to assume that there were additional records reflecting additional treatment by Dr. Dowling. (Doc. No. 19 at 17.) However, the ALJ does not address this note in his opinion. Rather, he states that "there are no treating psychological or psychiatric function opinions in the record." (Tr. at 38.) Accordingly, the ALJ's RFC assessment is not grounded on all the relevant evidence, and remand is warranted for further development of the evidence.

### 2. The ALJ Did Not Properly Consider New and Material Evidence Submitted to the Appeals Council

Once Champion was represented by counsel, new and material evidence was submitted to the Appeals Council in conjunction with a representative brief in support of the request for a review of the ALJ's decision. (*Id.* at 315-18.) The evidence included a Wellness Plan Report from Dr. Dowling dated December 22, 2014, indicating that Champion had been diagnosed with depressive disorder, panic disorder without agoraphobia, and post-traumatic stress disorder, including details of Champion's symptoms. (*Id.* at 27-28.) Dr. Dowling concluded that Champion was unable to work for at least twelve months and that she might be eligible for long-term disability benefits. *Id.* The evidence also included twelve pages of progress notes from Dr. Fox, dated May 2014, as well as a letter dated June 11, 2014, reflecting that Champion was being treated for major depressive disorder. (*Id.* at 312, 790-801.) Lastly, the evidence included a Biosocial Summary Report from FEGS WeCare Representative Yailemys Ponce, dated August 20, 2014, (*Id.* at 802-45.), revealing that Dr. Dowling was treating Champion for major depressive disorder and that her symptoms included suicidal ideation and violent behavior towards others. (*Id.* at 809-10.)

Under the rules and regulations of the Social Security Act, the Commissioner has the capability to remand unfavorable ALJ decisions if new and material evidence is submitted. 10 C.F.R. §§ 404.970, 416.1470. Evidence is considered "new" and "material" under the Act when

it (1) relates to the period on or before the date of the ALJ decision, and (2) is contrary to the actions, findings, or conclusions of the ALJ. 42 U.S.C. § 405(g); 20 C.F.R. § 404.970(b); HALLEX 1-3-3-6. As previously discussed, during the hearing, Champion indicated that she was treated by a "therapist" approximately three times per week for her mental health impairments and noted being on medication for her mental health conditions. (*Id.* at 91-92, 94.)

Champion alleges that the evidence from Dr. Fox, Dr. Dowling, and Yailemys Ponce is new and material because it pertains to May 14, 2012, to November 10, 2014, and because it documents ongoing evidence of Champion's mental health limitations in contradiction of the ALJ's findings that Champion suffered only non-severe psychiatric impairments. (Doc. No. 17 at 17-18.) The Appeals Council denied Champion's request for review, stating that the new information "does not affect the decision about whether you were disabled beginning on or before November 10, 2014." (*Id.* at 2.)

The Commissioner argues that the Appeals Council did consider Dr. Fox's report from May 31, 2014, and that although they deemed it new and material, they concluded that it did not provide any basis for changing the ALJ's decision because Champion reported that she felt better with talk therapy and had fewer panic attacks. (Doc. No. 19 at 24.) Additionally, the Commissioner claims that Dr. Dowling's report did not pertain to the period at issue because although it opined that Champion was "unable to work for at least 12 months," the report was dated December 22, 2014, and did not give any indication that the opinion was retrospective to any earlier period. (Doc. No. 19 at 24-25; Tr. at 27-28.)

According to the Act, the relevant period of disability begins "on the day the disability began." 42 U.S.C. § 416(i)(2)(C)(i). The relevant period concludes the month preceding the month in which the individual attains retirement age; the month preceding the termination

month; or, if earlier, the first month for which no benefit is payable during the 36-month period following the end of the individual's trial work period. 42 U.S.C. § 416(i)(2)(D). Therefore, Dr. Dowling's report does pertain to the relevant time period. The ALJ did not consider this evidence in making his decision. Further, without reviewing Champion's case, the Appeals Council determined that the evidence does not affect the ALJ's decision.

Accordingly, this decision warrants remand because the correct legal standards were not applied and the ALJ's decision at the Appeals Council level is not supported by substantial evidence.

### 3. The ALJ Failed to Properly Consider Champion's Credibility

Champion alleges that the ALJ failed to properly consider her credibility pursuant to the Social Security rules and regulations, which state that "[a]ll of the evidence in the case record, including the individual's statements, must be considered before a conclusion can be made about disability." (Doc. No. 17 at ii, 18-19; *See also* S.S.R. 96-7p.) The Act prescribes a two-step process for evaluating an individual's symptoms.[7] 20 C.F.R. §§ 404.1529(b), 416.929(b). First, a determination is made as to whether there exists an "underlying medically determinable physical or mental impairment" that could "reasonably be expected to produce the individual's pain or other symptoms." *Id.* Under this step, the ALJ is instructed not to "consider whether the *severity* of an individual's alleged symptoms is supported by objective medical evidence," but only whether the symptoms could be caused by an existing impairment. S.S.R. 16-3P, 2016 WL 1119029, at *1 (emphasis added). Step two involves the evaluation of the "intensity and persistence of an individual's symptoms, such as pain" and a determination of the "extent to

---

[7] A symptom is defined as "an individual's own description of her physical or mental impairments." S.S.R. 16-3P, 2016 WL 1119029, at *1.

which [the symptoms] limit the ability to perform work-related activities." 20 C.F.R. §§ 404.1529(c), 416.929(c).

Champion testified that she had a herniated disc flex spasm in her lower back and osteoarthritis in her back, knees, ankles, and right wrist. (*Id.* at 81-89, 93-94.) She testified that she was able to do laundry but was unable to shop for groceries because of her inability to bend, reach, or lift. (*Id.* at 101-02.) Champion noted being able to lift items like eggs or juice, but not a full grocery bag, and that she always had a small rolling cart with her for assistance. (Tr. at 102.) Champion further testified that she was only able to walk two to three blocks before she experienced lower back pain, stand for about one hour, and sit for no more than ten minutes. (*Id.* at 103.) In fact, Champion testified that she was "biting on the bottom of her lip" due to her back pain from sitting for so long during the hearing. *Id.* Champion also testified that she was unable to attend church regularly, was unable to visit friends or relatives, and needed assistance with even light housework like sweeping, mopping, and vacuuming. (*Id.* at 104.)

With regard to her psychiatric impairments, Champion testified that she suffered from anxiety attacks, occurring frequently, with each attack lasting a week and being caused by stress or the feeling of being closed in. *Id.* Champion also testified that she experienced mood swings and that a recent anxiety attack had been initiated by someone just sitting next to her on a train. (*Id.* at 89-90.) She also admitted that these panic attacks occurred at work, causing her to hide out in the bathroom for an hour or more. (*Id.* at 91.)

ALJ Penalver applied the two-step process for evaluation Champion's symptoms. First, he acknowledged that Champion's impairments could "reasonably be expected to cause the alleged symptoms." (*Id.* at 42.) In the second step, however, he concluded that her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely

credible," remarking that "nothing in the medical evidence of record shows that [Champion] is precluded from performing mental or physical related work activities, which is again supported by the fact that she is currently working full-time and has worked full-time since August 2013." (*Id.* at 43.)

The ALJ's rejection of Champion's symptoms is not based on substantial evidence because he disregarded medical evidence of Champion's disability. *See Ericksson*, 557 F.3d at 82-84. The ALJ accurately noted that Champion was able to pursue and obtain a college degree, but he failed to address whether Champion had any physical or mental limitations in being able to pursue this degree. In making his determination, the ALJ failed to consider Champion's psychiatric records from Dr. Dowling. Additionally, treatment notes from Dr. Fox indicate that Champion was concerned that she would not be able to continue with school because of her medical impairments. (Tr. at 588.)

Further, while the ALJ discredited Champion's allegations of disability because of her ability to pursue "two full-time jobs" during the period at issue, the ALJ failed to acknowledge Champion's testimony regarding multiple work absences because of asthma and back pain. (*Id.* at 70-73.) Additionally, the ALJ's indications that these jobs were "full-time" are inconsistent with the record and the ALJ's decision: the only full-time job that Champion admitted to performing was her full-time security officer position. (*Id.* at 72-73.) Her other occupations were identified as a part-time mental health counselor position for approximately four months, and a work-study job at Boricua College averaging 17-21 hours per week. (*Id.* at 70, 72.)

Further, ALJ Penalver's determination that Champion was performing full-time employment during the period at issue is inconsistent with the ALJ's findings at step two of the Sequential Evaluation Process. There, the ALJ determined that "[although Champion]

performed work … none of her 2013 earnings have met the monthly earning requirements for [substantial gainful activity]."[8] (*Id.* at 35.) If Champion has not been engaged in substantial gainful activity since her onset date, it is unclear how she could be found to have been fully employed.

Also in his decision, the ALJ found that Champion was not credible because she only took over-the-counter medication for her back pain, stopped physical therapy treatment modalities, and never underwent surgery for her conditions. (Tr. at 42-43.) However:

> … [an] adjudicator must not draw inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

S.S.R. 96-7p, 1996 WL 374186, at *7.

The ALJ never pursued any explanation as to why Champion was only taking over-the-counter medication and was no longer seeking physical therapy. Therefore, the ALJ's determination that this reflected a lack of credibility was merely an inference that S.S.R. 96-7p expressly prohibits. The records document that Champion had no improvement from prior medical treatment and had significant co-morbidities that further complicated her conditions, including a heart condition, hypertension, chronic asthma, and diabetes mellitus. (*Id.* at 423.) Accordingly, the lack of more aggressive treatment for these conditions was not indicative of Champion's ability to work.

---

[8] "[Champion] earned $8,399 over four quarters in 2013 or around $700 a month (Exhibit 12D.) As per POMS Section DI 10501.015, [Champion] was required to have earned at least $1,040 a month in the 2013 calendar year to meet the earnings requirement at the substantial gainful activity level." (Tr. at 35.)

### D. Remand

Champion requests that the Commissioner's decision be remanded for further administrative proceedings, including a *de novo* hearing and decision. Remand for further administrative proceedings is appropriate "[w]here there are gaps in the administrative record or the ALJ has applied an improper legal standard," *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999), or when the decision is not based on substantial evidence. 42 U.S.C. § 405(g). Here, remand is appropriate because ALJ Penalver's assessment of Champion's psychological symptoms is not based on substantial evidence and the ALJ must consider new and material evidence submitted to the Appeals Council. I recommend that this case be remanded for the ALJ to develop the record and reevaluate Champion's RFC.

## IV.  CONCLUSION

For the reasons set forth above, I recommend that Champion's motion for judgment on the pleadings be **GRANTED**, the Commissioner's cross-motion be **DENIED**, and this case be **REMANDED** to the Commissioner for reconsideration in accordance with this Report and Recommendation.

The Parties shall have fourteen days (14) from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Analisa Torres, 500 Pearl Street, Room 2210,

New York, New York 10007, and to the chambers of the undersigned, 500 Pearl Street, Room 1970, New York, New York 10007.

Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1) (West Supp. 1995); Fed. R. Civ. P. 72, 6(a), 6(d).

**DATED: September 14, 2017.**
**New York, New York**

**Respectfully Submitted,**

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**